UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **TONY JOHNSON** | * | **CIVIL ACTION** |
| **(DOC No. 295222)** | * | |
| | * | **NO. 15-038-JWD-RLB** |
| | * | |
| **VERSUS** | * | **JUDGE JOHN W. DEGRAVELLES** |
| | * | |
| | * | **MAGISTRATE JUDGE** |
| **TYLER HOLLIDAY, ET AL** | * | **RICHARD L. BOURGEOIS, JR.** |

**MEMORANDUM IN OPPOSITION TO TYLER HOLLIDAY'S
MOTION FOR NEW TRIAL OR REMMITITUR**

MAY IT PLEASE THE COURT:

Plaintiff Tony Johnson respectfully submits the following legal authorities in opposition to Tyler Holliday's motion for new trial or, in the alternative, motion for remittitur:

**I.   FACTS**

This matter was tried before a jury on February 3, 2020 through February 6, 2020. On the final day of trial, the jury returned a verdict finding that Tyler Holliday violated Tony Johnson's Eighth Amendment right to be free from sexual assault while incarcerated. The jury awarded Mr. Johnson compensatory damages against Mr. Holliday for violation(s) of Mr. Johnson's constitutional rights up to and including March 21, 2014 with:

Past and Future Physical Pain and Suffering: $100,000.00

Past and Future Mental Anguish and Emotional Distress: $100,000.00

Loss of Enjoyment of Life: $ 50,000.00

The jury also awarded Mr. Johnson compensatory damages against Mr. Holliday for violation(s) of Mr. Johnson's constitutional rights of March 22, 2014 with:

Past and Future Physical Pain and Suffering: $100,000.00

Past and Future Mental Anguish and Emotional Distress: $100,000.00

Loss of Enjoyment of Life: $ 50,000.00

Finally, in addition to the compensatory damages totaling $500,000, the jury also awarded Mr. Johnson punitive damages against Tyler Holliday of $250,000. A judgment reflecting these findings was entered by this Court on February 20, 2020.[1]

## II.   LAW AND ARGUMENT

Tyler Holliday's motion for new trial should be denied because the jury's verdict was not "against the great weight" of the evidence, including scientific evidence. Mr. Holliday's motion also fails because the William Blalock video deposition and the evidence of Tyler Holliday's homosexuality were properly admitted into evidence. Finally, Holliday's remittitur request should be denied because the jury verdict was reasonable and in line with other cases of rape by a corrections officer or police officer.

### A.   Legal Standard.

The court may grant a new trial on all or some of the issues—and to any party—as follows: after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court. *See* Fed. R. Civ. P. 59(a)(1)(A). In the Fifth Circuit, the district court may grant a new trial for reasons that include "if the district court finds the verdict is against the weight of the evidence, the damages awarded are excessive, the trial was unfair, or prejudicial error was committed in its course." *Smith v. Transworld Drilling Co.*, 773 F.2d 610, 613 (5th Cir. 1985) (citations omitted). However, "new trials should not be granted on evidentiary grounds unless, at a minimum, the verdict is against the great not merely the greater

weight of the evidence." *Conway v. Chem. Leaman Tank Lines, Inc.*, 610 F.2d 360, 363 (5th Cir. 1980) (citing *Love v. Sessions*, 568 F.2d 357 (5th Cir. 1978)). "In making this determination, the district court weighs all of the evidence, and it need not view it in the light most favorable to the nonmoving party. This does not mean that a judge may order a new trial simply because he disagrees with the jury verdict." *Ellerbrook v. City of Lubbock, Tex.*, 465 Fed. Appx. 324, 336 (5th Cir. 2012) (citations and quotations omitted). The judge must not "simply substitute his judgment for that of the jury, thus depriving the litigants of their right to trial by jury." *Conway*, 610 F.2d at 363 (citing *Love*, 568 F.2d at 361). It is within the sound discretion of the trial court to determine whether to grant or deny a motion for new trial. *Pryor v. Trane Co.*, 138 F.3d 1024, 2016 (5th Cir. 1998).

### B.   The Jury Verdict Was Not Against the Great Weight of the Evidence.

The jury verdict in this matter was not against the great weight of the evidence. To the contrary, the verdict was in line with substantial evidence presented by Mr. Johnson, which was not outweighed, much less greatly outweighed, by evidence presented by Holliday. Mr. Johnson introduced evidence that on every date he was sexually assaulted, Tyler Holliday was working in Camp D, which Tyler Holliday did not refute.[2] Additionally, Mr. Holliday was assigned to the Falcon Office on each date except January 6, 2014.[3] Even though he was not assigned to the Falcon Office on January 6, 2014, Holliday was a "key lieutenant" and could go wherever he wanted to go in the unit, including relieving the sergeant who was assigned to the Falcon Office

---

1 R. Doc. 272 Judgment.
2 Exhibit P5-005, P5-031–039; **Ex. H -** Feb. 4, 2020 trial transcript, p. 41 (Holliday testimony that he was working in Camp D on all dates of alleged rapes.)
3. *Id.*

on January 6, 2014.[4] Holliday did not refute this in his testimony or deny that he could have been in the Falcon Office as alleged by Mr. Johnson on all of the dates the rapes occurred, including January 6, 2014.

Mr. Johnson testified that the rapes happened around shift change, usually between 4:30p and 5:00p.[5] Tyler Holliday confirmed that around shift change he locked all of the prisoners in their dorms to limit foot traffic on the Falcon walk.[6] This evidence establishes an opportunity for Holliday to commit the rapes. Mr. Holliday tries to make something out of the various logbooks admitted into evidence to suggest that if Holliday did not sign a logbook in a dorm, then he absolutely could not have gone to that dorm. Holliday described an "official round" to be when a supervisor or officer would enter a dorm, sign the logbook, punch a timeclock in the back of the dorm, and leave.[7] He then testified that he did not "make rounds" and sign logbooks in the dorms between 4:00 and 5:00 pm; but, importantly, he presented no evidence or testimony to establish that he did not go into the dorms between those times.[8] He could be anywhere he wanted to be, logbook or not. The door to Mr. Johnson's dormitory was directly across the walk from the Falcon Office.[9] Holliday also did not refute Mr. Johnson's testimony that Holliday went into Falcon 1 and retrieved Mr. Johnson for six of the rapes, as Mr. Johnson testified.

Holliday also points to other logbooks or timecards that allegedly show that Holliday was "almost always making rounds in other areas of the unit between 4:30 and 5:00 pm."[10] First, Holliday never established at trial that he punched any clock or signed any logbook. None of the

---

4 **Ex. H -** Feb. 4, 2020 trial transcript, p. 258.
5 *Id.* at 232.
6 *Id.* at 31–33.
7 *Id.* at 51.
8 *Id.* at 51–52.
9 *Id.* at 84.
10 R. Doc. 277-1 at 3.

evidence was presented to him to establish his signatures or initials on any document. Second, even if the records bear Holliday's signature or initials, none of the records account for all of Holliday's time during the period of 4:30 to 5:00 pm on the dates of the rapes. Warden Delaney testified that it would take "twenty seconds" or "twenty five seconds" to walk back to the Falcon Office after punching a clock in the Hobby Shop.[11] Moreover, Holliday himself did not testify that he was unable to have performed the rapes on the relevant dates. In fact, Holliday testified that on at least two occasions, he masturbated in the Falcon Office around shift change,[12] which proved that he had an opportunity to be alone in the Falcon Office for long enough to sexually gratify himself, which the jury may infer was similar to the time needed to rape Mr. Johnson.

Holliday does not address in his motion the "great weight" of evidence by other victims who claimed that Holliday sexually abused his rank and authority as a lieutenant and forced inmates and even a cadet—a free person—to expose their penises in the Falcon Office. Former cadet William Blalock testified that Holliday tried on two separate days to have Blalock expose his erect penis to Holliday in the Falcon Office, on March 12 and March 13, 2014.[13] On March 12, 2014, the first time Blalock had ever met Holliday, Holliday asked to see Blalock's erect penis.[14] When it did not happen that day, Holliday called Blalock back to the Falcon Office the following day and eventually did persuade Blalock to expose his penis.[15] Again, this evidence shows that Holliday had intent to sexually gratify himself in the Falcon Office and that he had an opportunity to do so—an opportunity to rape Tony Johnson.

The written complaint of Tyrone Dunbar, the entirety of which was read into the record

---

11  **Ex. H -** Feb. 4, 2020 trial transcript, p. 83.
12  *Id.* at 30, 33–37.
13  R. Doc. 271 Deposition Transcript of Video Trial Testimony of William Blalock at 10–13.
14  *Id.*

by Major Michael Vaughn on day one of trial, also tends to establish that Holliday sexually abused him in the Falcon Office during the same timeframe as when Mr. Johnson was raped by Holliday.[16] Dunbar's written statement, to which Defendants stipulated admissibility, was evidence: (1) that Holliday forced Dunbar to masturbate in the Falcon Office; (2) that Holliday asked that Dunbar allow Holliday to perform oral sex on him; (3) that Holliday masturbated Dunbar; and (4) that Holliday masturbated himself and ejaculated onto Dunbar.[17]

Even though Dunbar denied at trial that he had been sexually abused by Holliday, his written statements to investigators from 2014, all of which were admitted into evidence without objection as P16-001–006, are evidence that Holliday sexually abused him. While Dunbar's testimony contradicted his prior written statements, Dunbar's testimony in no way contradicted Tony Johnson's "version of events" as Holliday claims in his motion, which he baldly asserts without support and without identify how Mr. Johnson's testimony was contradicted by Dunbar.

Mr. Holliday also contends that the verdict was against the "great weight of the scientific evidence" that came in through the testimony of Dr. Monte Miller because the forensic testing on the napkin tested at the Louisiana State Police Crime Lab and Scales Biological Laboratory, Inc. showed that Mr. Johnson was excluded as a contributor to DNA found on the napkin.[18] First, even without the DNA evidence to conclusively show that Tony Johnson collected Tyler Holliday's semen in the napkin into which he spit and then gave to Major Vaughn, there is sufficient evidence from which to find that Tyler Holliday raped Tony Johnson. Second, the jury heard evidence from which it could find that someone tampered with the sample Mr. Johnson

---

15 *Id.* at 14–15.
16 Exhibit P16-004–006
17 *Id.*.
18 R. Doc. 277-1 at 4.

gave to investigators.

Dr. Miller's testimony established that 1) Tony Johnson's DNA would have been on the napkin if he spit into it;[19] 2) the napkin Tony Johnson gave to Major Vaughn was still wet when Mr. Johnson gave it to Major Vaughn;[20] 3) a wet napkin wadded in a piece of plastic would start to mold and mildew in about three days and be "covered with mold and mildew in six or seven days";[21] 4) the sample was not opened from March 28 through June 2, 2014; 5) but was not covered with mold or mildew and had "very little," if any when examined by the Louisiana State Police Crime Lab; 6) meaning that "it would have had to likely been dry soon after Major Vaughn collected it.[22] Additionally, the unknown contributor on the sample was more likely than not an unknown female.[23]

From this evidence, the jury could believe that someone switched the napkin or otherwise tampered with it before it was tested. How did it dry out if it was kept in the plastic bag, within the sealed evidence bag, as the records indicated? The jury would have to believe that Mr. Johnson went through the effort of giving a napkin to investigators on which his DNA was not found, but on which Tyler Holliday's DNA was present. Both Mr. Johnson's testimony and Mr. Dunbar's statement indicate that both believed Angola would tamper with evidence or try to "hide and sweep . . . under the rug" the misdeeds of its own.[24] Just because the evidence does not conclusively prove Holliday's guilt, it does not prove that Tony Johnson did not give Major Vaughn exactly what he said he gave.

Conflicting evidence from which a jury may infer one conclusion or an opposite

---

19  **Ex. I -** Feb. 5, 2020 trial transcript, p. 140.
20  *Id.* at 141.
21  *Id.* at 141–42.
22  *Id.*

conclusion does not give rise to a new trial.

### C. The Video Deposition of William Blalock Was Properly Admitted.

Mr. Holliday objects to the video deposition of William Blalock being admitted at trial. The parties stipulated that the video would be taken for purposes of trial; however, Holliday posits that Mr. Johnson "offered no evidence to support" this contention, "which was expressly denied by Holliday's previous legal counsel [Christopher Walters] during the trial."[25] While current counsel for Holliday was not privy to the email exchanges among counsel at that time, the supposition that there is no evidence of an agreement to take the deposition for use at trial is demonstratively false.

On November 7, 2016, counsel for Mr. Johnson advised that Mr. Blalock's deposition would be taken if he could be located and served, "and his testimony will be perpetuated through the deposition for use at trial." **Exhibit A** (Email Carmen Hebert to Christopher Walters, *et al.*, Nov. 7, 2016 at 10:44 a.m.). Mr. Johnson also proposed, as an alternative to incurring the time and expense of finding and deposing Mr. Blalock, who was believed to live in Mississippi and more than 100 miles from the federal courthouse in Baton Rouge, that the parties stipulate that Mr. Blalock's trial testimony would be the same as the facts in Mr. Blalock's written statement to Major Vaughn on March 25, 2014. *See* **Exhibit B** (Email Carmen Hebert to Christopher Walters, *et al.*, Nov. 7, 2016 at 5:55 p.m.). Counsel for all Defendants[26] rejected the proposed stipulation and agreed to participate in the deposition. **Exhibit C** (Email Christopher Walters to Carmen Hebert, *et al.*, Nov. 10, 2016 at 10:49 a.m., final paragraph).

---

23 *Id*.
24 Exhibit P16-001 (Dunbar ARP); **Ex. H -** Feb. 4, 2020 trial transcript, p. 247 (Johnson testimony).
25 R. Doc. 277-1 at 5.
26 This exchanged occurred several years before Courtney Joiner enrolled as separate counsel for Tyler Holliday in

Eventually, Mr. Blalock was located. On February 3, 2017 counsel for Mr. Johnson proposed four dates on which the trial deposition of William Blalock could be taken. **Exhibit D** (Email Joseph Long to Christopher Walters, *et al.*, Feb. 3, 2017 at 12:52 p.m.). Counsel for Defendants replied on February 7, 2017, confirming February 24, 2017 and requesting particulars for the location and Mr. Blalock's contact information. **Exhibit E** (Email Christopher Walters to Joseph Long, et al., Feb. 7, 2017 at 9:52 a.m.). Plaintiff issued a *Notice of Video Trial Deposition for William Lee Blalock, Jr.*, which was sent to counsel for all defendants on February 14, 2017 at 12:52 p.m. **Exhibit F** (Email Joseph Long to Christopher Walters, et al., Feb. 14, 2017 at 12:52 p.m.) and **Exhibit G** (*Notice of Video Trial Deposition for William Lee Blalock, Jr.*, attached to Exhibit G email with file name "Notice of Video Depo Blalock.docx"). The notice of deposition specifically provides that the oral deposition would be "for all purposes, including for use at trial." *See* **Exhibit G**.

Christopher Walters, then-counsel for all Defendants, participated in the deposition and questioned Mr. Blalock on cross-examination.[27] Defendants' counsel's participation in the stipulated trial deposition of Mr. Blalock satisfies all requirements for the trial deposition to be utilized as proposed by Mr. Johnson at the trial of this matter. Holliday cites no authority that the parties cannot stipulate to a video deposition being taken for the purposes of using the video at trial. Further, Holliday had the opportunity to subpoena Blalock for live testimony if he so desired, which he failed to do. This court has previously ruled that the video was admissible, and that ruling should stand; it does not justify granting a new trial.

---

this matter.
27  R. Doc. 271 Deposition Transcript of Video Trial Testimony of William Blalock at 21–22.

D. **The Evidence of Tyler Holliday's Sexuality Was Properly Admitted and Subject to a Limiting Instruction.**

Evidence regarding Tyler Holliday's homosexuality was admitted to the jury through the testimony of Tyler Holliday. When asked if he had ever had oral sex or had oral sex performed on him by a man, Holliday replied, "No."[28] First, his denial that he has ever had oral sex performed on him by a man or performed oral sex on a man is relevant to his credibility. Two witnesses (Blalock and Dunbar) described Holliday's interest in seeing their erect penises, and Tony Johnson testified that Holliday forced him to perform oral sex on Holliday. Dunbar's statement also indicated that Holliday represented to him that Holliday had a girlfriend,[29] which is contrary to Holliday's trial testimony.[30] Whether Holliday is homosexual and thus sexually attracted to men is relevant to the issue of whether Holliday would be inclined to engage in sexual acts with these men. Holliday put the matter at issue when he denied that he was homosexual during the time period in which Johnson, Dunbar, and Blalock's sexual encounters with him occurred, only realizing he was homosexual approximately nine months later in January 2015.

Second, the Court gave a limiting instruction at the behest of Holliday that instructed the jury to consider the evidence of Tyler Holliday's homosexuality "for the purpose of deciding whether the alleged sexual abuse claimed by Johnson did or did not occur or whether other evidence of Holliday's conduct, which has or will be admitted into evidence, do or did not occur and for no other purpose."[31] Holliday should be deemed to have accepted the utility of the limiting instruction, or he would not have requested it.

---

28  **Ex. H -** Feb. 4, 2020 trial transcript, p. 43.
29  Exhibit P16-004.
30  **Ex. H -** Feb. 4, 2020 trial transcript, pp. 43–44.

Finally, as the court noted in R. Doc. 262 Minute Entry from Status Conference held on February 3, 2020 prior to trial commencing, during voir dire of the jury, the Court asked "Do any of you have such strong feelings on the issue of homosexuality that it would affect your ability to be fair and impartial to both sides," to which no person in the venire indicated that he or she did. This is further evidence that Holliday's homosexuality did not unfairly prejudice him. No new trial is warranted.

### E. The Damages Awarded to Tony Johnson Are Not Excessive and Are Rationally Based on the Evidence and Harm Proven.

Mr. Johnson was awarded compensatory damages of $500,000 based on the jury's finding that Tyler Holliday sexually abused Mr. Johnson at least twice—$250,000 for constitutional violation(s) up to and including March 21, 2014 and $250,000 for constitutional violation(s) of March 22, 2014.[32] The verdict form and jury questionnaire did not require the jury to identify the precise number of times that it believed Tyler Holliday sexually assaulted Tony Johnson. Even if the jury only believed that Mr. Johnson was raped twice (one being the constitutional violation on or before March 21 and one being the constitutional violation of March 22), the compensatory damages award should stand.

"Physical injury, pain and suffering, personal humiliation, mental distress, and embarrassment are all compensable under § 1983." *Tubby v. Allen*, 6:16CV972, 2019 WL 4565072, at *5 (E.D. Tex. Sept. 3, 2019), report and recommendation adopted, 6:16-CV-972-JDK-KNM, 2019 WL 4538028 (E.D. Tex. Sept. 19, 2019) (citing *Benoit v. Bordelon*, 596 F. App'x 264, 269–70 (5th Cir. 2015)). "In a § 1983 action damages must be proved, rather than presumed." *Id*. (citing *Williams v. Bd. of Regents of Univ. Sys. of Georgia*,

---

31 **Ex. H -** Feb. 4, 2020 trial transcript, p. 44–45.

4837-9049-7717, v. 1

629 F.2d 993, 1005 (5th Cir. 1980)). Under 42 U.S.C. § 1983, a "Plaintiff may recover not only for any direct physical injuries from the sexual assault, but also for the resulting emotional distress." *Id.*; *see also*, *Memphis Community Sch. Dist. v. Stachura*, 477 U.S. 299, 307 (1986) (under section 1983, "compensatory damages may include . . . such injuries as . . . personal humiliation, and mental anguish and suffering") (internal quotation marks omitted) (quoting *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 350 (1974)).

Here, Mr. Johnson put on evidence that he suffered physical, emotional, and psychological injuries. The parties stipulated to the entry of medical records of Dr. Christopher Lartigue in which Dr. Lartigue diagnosed Mr. Johnson with post-traumatic stress disorder (PTSD) as a result of the rapes Mr. Johnson suffered at the hands of Tyler Holliday.[33] Mr. Johnson had never been diagnosed with PTSD or any other mental issues prior to Dr. Lartigue's diagnosis.[34] Dr. Lartigue's record shows that Mr. Johnson reported to him "intrusive repetitive thoughts" about the incidents, and that Mr. Johnson was "watchful/wary of everyone during the day, startles easily, has upwellings of fear during which he thinks he's being stalked, and describes intermittent feelings of 'emptiness and sadness.'"[35]

Dr. Amy Stogner, a social worker who treated Mr. Johnson at Rayburn Correctional Center, testified at trial regarding Mr. Johnson's PTSD and the symptoms he exhibited. He reported to her that he had issues with insomnia, increased anxiety, depression, and at times not having an appetite.[36] He would also "smell cologne coming up behind him" and worried about

---

32 See R. Doc. 272 Judgment.
33 Exhibit P1-001.
34 **Ex. H -** Feb. 4, 2020 trial transcript at p. 266.
35 Exhibit P1-001.
36 **Ex. H -** Feb. 4, 2020 trial transcript at p. 57.

too many people being around.³⁷ Ms. Stogner would go over the symptoms that he had to help find coping skills to be able to handle the triggers.³⁸ Mr. Johnson could not be assigned to work release until August 5, 2015, more than a year after he began seeing Amy Stogner for his PTSD, because of his "increases in panic attacks" and anxiety.³⁹ She testified that whether PTSD is a life-long problem "depends on the individual."⁴⁰

Mr. Johnson also testified at trial regarding his treatment for mental health issues following the rapes. He found it hard to sleep and had repeated thoughts about the rapes, so he sought treatment at Rayburn Correctional Center, where Dr. Lartigue diagnosed him with PTSD and Ms. Stogner offered counseling to him.⁴¹ He testified that he remembered the smell of Holliday's cologne and "would always smell cologne."⁴² Additionally, "to this day," six years after the sexual assaults, he does not go into any closed rooms with anyone, and he still has flashbacks.⁴³ The smell of cologne "triggers" him "instantly," and he does not wear cologne now.⁴⁴ He still sees a psychiatrist and a counselor, as well.⁴⁵

The $500,000 in compensatory damages awarded in this case is within the range of damages awarded in cases with similar fact patterns where a person was "raped by a person who possessed authority over his person." *Tubby*, 2019 WL 4565072, at *6 (E.D. Tex. Sept. 3, 2019). In *Tubby*, an inmate who was raped once by a corrections officer was awarded $300,000 in compensatory damages and $350,000 in punitive damages. *Id*. at 7-8. The magistrate judge in

---

37  *Id.*
38  *Id.* at 58.
39  *Id.* at 59–60.
40  *Id.* at 60.
41  *Id.* at 265–66.
42  **Ex. H -** Feb. 4, 2020 trial transcript at p. 267.
43  *Id.* at 267–68.
44  *Id.* at 268.
45  *Id.* at 269–70.

*Tubby* who recommended these amounts for compensatory and punitive damages surveyed other cases in which a person was raped by a corrections officer or police officer, finding most similarity to *Mathie v. Fries*, 151 F.3d 808 (2nd Cir. 1997). In *Mathie*, an inmate was sodomized by a corrections officer on one occasion and "developed PTSD and 'suffer[ed] from episodes of panic attacks, sleeplessness, insecurity, and anxiety as a result of [the defendant's] sexual abuse and sodomy.'" *Tubby*, 2019 WL 4565072, at *6 (quoting *Mathie*, 151 F.3d at 812, 814). An award of $250,000 in compensatory damages was appropriate, where the "court further noted that '[t]he emotional distress of the sexual abuse inflicted . . . [was] inevitably aggravated by the fact that the acts were committed by a jailor upon an inmate in his custody.'" Id. (citing *Mathie* 151 F.3d at 814).

Mr. Johnson's PTSD, panic attacks, sleeplessness, insecurity and anxiety are very similar to the Plaintiff in *Mathie*, and his award is within reason, considering he was raped multiple times, not just once. Without pointing the court to any cases to demonstrate how the compensatory damages award was "clearly excessive," or what damages were awarded in comparable cases, Holliday baldly proclaims that Mr. Johnson was overcompensated and deserves "modest damages." As demonstrated herein, the jury's verdict and compensatory damages award of $500,000 is completely in line with similar cases of sexual assault by prison guards against inmates.

Finally, although Holliday does not challenge the $250,000 punitive damages award, similar awards have been rendered in other courts in the Fifth Circuit and elsewhere. *See, e.g.*, *Tubby v. Allen*, 6:16CV972, 2019 WL 4565072, at *8 (E.D. Tex. Sept. 3, 2019) ($350,000 punitive damages against prison guard who raped inmate and whose "use of his position as a correctional officer to gain access to and victimize a person in custody was an outrageous abuse

4837-9049-7717, v. 1

of power and authority"); *Doe v. Neal*, No. SA-14-CA-102-XR, 2015 WL 3688259, at *4 (W.D. Tex. June 12, 2015) (awarding $750,000 in compensatory damages and $1,000,000 punitive damages against a police officer who pulled plaintiff over in his patrol car, placed her in handcuffs, and raped her); *Stokes v. Delcambre*, 710 F.2d 1120, 1127 (5th Cir. 1983) ($310,000 punitive damages against warden and deputy following prison rape by inmate, which may have been on the "high side" but was "not beyond that which on these facts is sustainable").

### III.  CONCLUSION

Tyler Holliday's motion for new trial, or in the alternative, for remittitur, should be denied. The jury weighed the evidence carefully in this case, and its verdict is not against the great weight of this case. There is no injustice unfairness or prejudicial error. Holliday would require this Court to usurp the findings of the jury and instead adopt his version of the facts as true, which is not appropriate under the legal standards for a new trial. Because the verdict and award are supportable and within the range of reason for a prisoner raped multiple times by his jailer, the motion for remittitur should likewise be denied.

Respectfully submitted by:

*/s/ Carmen T. Hebert*
Carmen T. Hebert, Bar # 33179
Carleton Hebert Wittenbrink & Shoenfelt, LLC
400 Convention Street, Suite 550
Baton Rouge, LA 70802
Tel: (225) 282-0602
Fax: (877) 443-9889
chebert@lawfirmbr.com
Attorney for Tony Johnson