# UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF LOUISIANA

**TONY JOHNSON (DOC No. 295222)**

**VERSUS**

**TYLER HOLLIDAY, ET AL.**

**CIVIL ACTION**

**NO. 15-38-JWD-RLB**

## RULING AND ORDER

This matter comes before the court on the *Motion for New Trial or, in the Alternative, Motion for Remittitur* (Doc. 277) filed by Defendant Tyler Holliday ("Holliday").[1]  Plaintiff Tony Johnson ("Plaintiff") opposes the motion. (Doc. 285.)  Holliday has filed a reply. (Doc. 287.)  Oral argument is not necessary.  The Court has carefully considered the law, the facts in the record, and the arguments and submissions of the parties and is prepared to rule.  For the following reasons, Holliday's motion is denied.

## I.    Relevant Factual Background

From January to March of 2014, Plaintiff Tony Johnson was an inmate housed at Louisiana State Penitentiary at Angola, Louisiana ("LSP" or "Angola").  Defendant Tyler Holliday served as a Lieutenant at Angola in Camp D, where Plaintiff was housed.   Plaintiff alleges that, from January 6, 2014, to March 22, 2014, Defendant Tyler Holliday forced Plaintiff to perform oral sex on him seven times in violation of his Eighth Amendment right against sexual abuse.

This matter was tried before a jury on February 3–6, 2020. (Docs. 262–263, 266–267.)  On February 6, 2020, the jury returned a verdict finding that Holliday violated Plaintiff's Eighth Amendment rights. (Doc. 269 at 1.)    The jury awarded Plaintiff the following compensatory

---

[1] Other Defendants in this action included Joseph Lamartiniere, Leslie Dupont, and Burl Cain.  These Defendants prevailed at trial (*see* Doc. 269 at 2–3) and thus do not join in this motion.

damages for those violations which occurred up to and including March 21, 2014: $100,000 in past and future physical pain and suffering; $100,000 in past and future mental anguish and emotional distress; and $50,000 in loss of enjoyment of life.  (*Id.* at 4.)  The jury also awarded Plaintiff the following compensatory damages for the Eighth Amendment violation which occurred on March 22, 2014: $100,000 in past and future physical pain and suffering; $100,000 in past and future mental anguish and emotional distress; and $50,000 in loss of enjoyment of life. (*Id.*)  Lastly, the jury awarded $250,000 in punitive damages against Tyler Holliday. (*Id.* at 5.)  On February 20, 2020, judgment was entered against Holliday for the total sum of $500,000 in compensatory damages and $250,000 in punitive damages. (Doc. 272.)

Holliday now moves for a new trial or, alternatively, remittitur on three main grounds. First, Holliday argues that the jury verdict was against the weight of the evidence.  Second, Holliday contends that the Court made certain legal errors justifying a new trial.  And third, Holliday maintains that the jury award was unsupported by the evidence.  The Court will address each of these arguments in turn.

## II.   Relevant Standard

"The court may . . . grant a new trial on all or some of the issues—and to any party—as follows: . . . after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court[.]"  Fed. R. Civ. P. 59(a)(1)(A).  "A new trial may be granted, for example, if the district court finds the verdict is against the weight of the evidence, the damages awarded are excessive, the trial was unfair, or prejudicial error was committed in its course." *Smith v. Transworld Drilling Co.*, 773 F.2d 610, 613 (5th Cir. 1985) (citations omitted).  But, "new trials should not be granted on evidentiary grounds unless, at a minimum, the verdict is against the great not merely the greater weight of the evidence." *Conway v. Chem. Leaman Tank Lines, Inc.*, 610

2

F.2d 360, 363 (5th Cir. 1980) (citing *Love v. Sessions*, 568 F.2d 357 (5th Cir. 1978)). "In making this determination, the district court weighs all of the evidence, and it need not view it in the light most favorable to the nonmoving party. This does not mean that a judge may order a new trial simply because he disagrees with the jury verdict." *Ellerbrook v. City of Lubbock, Tex.*, 465 Fed. Appx. 324, 336 (5th Cir. 2012) (citations and quotations omitted). The judge must not "simply substitute his judgment for that of the jury, thus depriving the litigants of their right to trial by jury." *Conway*, 610 F.2d at 363 (citing *Love*, 568 F.2d at 361). Ultimately, "it is within the 'sound discretion of the trial court' to determine whether to grant or deny a motion for new trial." *Hickson v. Herbert*, No. 13-cv-580, 2017 WL 8793474, at *1–2 (quoting *Pryor v. Trane Co.*, 138 F.3d 1024, 2016 (5th Cir. 1998)).

### III.   Discussion

#### A.  Factual Sufficiency of the Verdict

##### *1. Parties' Arguments*

First, Holliday argues that the verdict was against the weight of the evidence. Holliday bases this position on (a) documentary evidence in the form of log books purporting to show Holliday's whereabouts on the days of the rapes; (b) DNA testing results of a paper towel which Plaintiff originally claimed had Holliday's seamen and Johnson's saliva and DNA on it but which subsequently was shown to exclude these DNA matches and the presence of seamen; and (c) the testimony of Kealo Higgins and Tyrone Dunbar, who originally claimed that Holliday sexually assaulted them but who, at trial, either refused to testify (Dunbar) or denied any assault took place.

Plaintiff responds that the verdict was supported by substantial evidence. Plaintiff points to the following:

- There is testimony that Holliday was working in Camp D on the dates in question and that he was a "key lieutenant" who could go where he wanted,

including relieving the sergeant assigned to the Falcon Office, where the sexual assaults took place.

- As to the logbooks, Holliday testified that signing the logbook was done on "official rounds" and that he did not make "rounds" between 4:00 and 5:00 p.m., when the rapes took place. Further, there was no evidence that Holliday signed the logbook or punched the clock, and, in any event, none of the records account for where Holliday was at the time of the rape because it took a mere twenty to twenty five seconds to walk back to the Falcon Office after punching the clock in the Hobby Shop.

- Holliday testified that on at least two occasions, he masturbated in the Falcon Office around shift change, which showed he had an opportunity to be alone in there to engage in sexual misconduct.

- William Blalock, a former cadet at Angola, testified that, in March 2014, Holliday forced him to expose his erect penis to Holliday in the Falcon Office. This shows opportunity to use the Falcon Office to gratify his sexual desires and an opportunity to do so.

- Although Dunbar refused to say at trial whether he had been abused, his written complaint was admitted into the record, and, in it, Dunbar stated that Holliday forced Dunbar to masturbate in the Falcon Office, that Holliday had asked Dunbar to allow Holliday to perform oral sex on him, that Holliday had masturbated Dunbar, and that Holliday masturbated himself and ejaculated onto Dunbar. Further, Dunbar made written statements to investigators that were admitted at trial that are further evidence of sexual abuse.

- As to the scientific evidence, (1) there is sufficient evidence in the record without DNA evidence to show that Holliday raped Johnson, and (2) the jury heard evidence that the sample was either tampered with or switched. "Just because the evidence does not conclusively prove Holliday's guilt, it does not prove that Tony Johnson did not give Major Vaughn exactly what he said he gave." (Doc. 285 at 7.)

Plaintiff maintains that, while there was conflicting evidence, this does not give rise to a new trial.

In reply, Holliday points to the "voluminous documentary evidence" purporting to prove that Holliday did not work on the Falcon Unit when the rapes occurred and that he did not make rounds between 4:30 p.m. and 5:00 p.m. (Doc. 287 at 2.) The records also purport to show that

Holliday never went into the dorms at those times and that he was "almost always making rounds in other areas on Falcon Unit" at those times. (*Id.* at 2–3.)  As to the scientific evidence, Plaintiff had no evidence of tampering, and this was not even raised until closing arguments.

### 2. Analysis

For the reasons largely identified by Plaintiff, the Court finds that a new trial is not warranted.  In short, there is substantial evidence supporting the jury verdict, and the verdict was not against the great weight of the evidence.

Aside from Plaintiff's own account of the rapes, Plaintiff presented evidence that Holliday had the motive and opportunity to use the Falcon Office to engage in wrongful sexual acts.  The most powerful evidence of this came from William Blalock, the former Angola cadet who testified that, in his first meeting with Holliday, Holliday twice offered him money and otherwise coerced him to expose his erect penis in the Falcon Office. (Blalock Dep. 10–13, 20, Doc. 271 at 11–14, 21.)  The Court finds this evidence of sexual harassment from a neutral third party—which Holliday now mentions only in an attempt to exclude on a technically, *see, infra*—is strong evidence in support of the jury's findings.

This is further supported by Holliday's testimony that, in late January and either February or early March, he twice masturbated in the Falcon Office between approximately 4:55 and 5:00 in the afternoon before a shift change, at a time where everyone was in their dorms, all gates were locked, he expected very little foot traffic, felt like he "had some privacy," and could see out the window to monitor down the Falcon Walk.  (*See* Pl. Ex. H, Tr. II at 30–34, Doc. 285-8 at 5–10.) This was around the time that Johnson said the rapes occurred—between 4:30 and 5:00 p.m. (Tr. II at 232, Doc. 285-8 at 25.)  Again, this is strong evidence of Holliday's motive and opportunity to use the Falcon office to engage in wrongful and inappropriate sexual acts.

Other evidence also supports the jury's finding. Again, Holliday was a "key lieutenant," meaning he was the "guy that controls the unit . . . the boss of that particular unit that he's on." (Tr. II at 258, Doc. 285-8 at 27.) A reasonable inference from this is that Holliday could go where he pleased. Additionally, Holliday testified that an official round was when an officer would enter a dorm, go to the logbook, sign in, and make his round around the dorm, and punch his card on the time clock. (Tr. II at 51, Doc. 285-8 at 17.) Holliday stated that he did not make rounds between 4:00 and 5:00 p.m. (*Id.* at 51–52, Doc. 258 at 17–18.) In any event, Warden Delaney testified that it was a short distance from the Falcon Office to the Hobby Shop and that if someone walked from there to the Falcon Office, it would take "twenty seconds, 25 seconds." (Tr. II at 83, Doc. 285-8 at 23.) Plaintiff was also housed directly across from the Falcon Office. (*Id.* at 83–84, Doc. 285-8 at 23–24.) All of this evidence further reflects that Holliday had the opportunity and means to carry out the rapes. This testimony also gives the jury reasonable grounds to reject the documentary evidence relied upon by Holliday.

The Court also finds that the scientific evidence is not dispositive. First, the Court agrees with Plaintiff that there is sufficient evidence, detailed above, from which the jury could find that Holliday raped Plaintiff, regardless of what the DNA tests yielded. Phrased another way, the jury verdict does not turn on the DNA results.

But second, putting that aside, the Court also agrees with Plaintiff that he has raised sufficient grounds from which the jury could have reasonably concluded that the scientific evidence was unreliable. Dr. Miller, the DNA expert, stated that, if Plaintiff had touched the paper towel, "there's a really good chance you would get DNA from the outside of that[,]" yet, despite the uncontradicted testimony that Johnson touched the paper towel, Johnson's DNA was not on the towel. (Pl. Ex. I, Tr. III at 140–41, 147, Doc. 285-9 at 5, 11.) Additionally, the sample appeared

wet in the picture, and, if it was wet, it would be covered in mildew and mold if it was not placed in a controlled environment in six or seven days. (*Id.* at 141–42, Doc. 285-9 at 5–6.)  But, the doctor stated that the sample did not get to the crime lab and a controlled environment for two months, and there was little mildew or mold on the sample. (*Id.*)  Miller also said there was a "complete gap" between when the evidence was collected and when it got to the crime lab. (*Id.*) Miller stated he had "no way of knowing" how the extra DNA profile of an unknown person got on the towel and that tampering was "certainly a possibility." (*Id.* at 143–47, Doc. 285-9 at 7–11.) Additionally, more likely than not, the unknown person was a female. (*Id.*)  All of these issues raise serious questions about the reliability of the DNA test.

Additionally, Dunbar's refusal to answer questions (Tr. II at 134–35, Doc. 274 at 134–35 ("I don't want to go through this. . . . I'm finished answering questions, sir.  . . . I don't want to answer no questions.")) also does not disprove Plaintiff's allegations.  The jury received into evidence a copy of Dunbar's ARP and Supplemental ARP (Ex. P16) which detailed Dunbar's allegations against Holliday.  Even if the ARP is hearsay, the ARP shows the fact that this complaint was made, and yet, Dunbar refused to testify on the subject at trial.  The jury also heard testimony from the Plaintiff that Holliday threatened Plaintiff into silence; specifically, Plaintiff said that Holliday told him that Holliday's mom and dad worked at Angola and that, if Plaintiff told anyone "they're going to lock your ass up.' (Tr. II at 232, Doc. 285-8 at 25.)  Plaintiff also testified that he lived at Angola for 18 years, that it was run "just like Louisiana is [run]," that it's a "close-knit environment," and that "they keep everything within the prison walls." (Tr. II at 258, Doc. 285-8 at 27.)  A reasonable jury could conclude from all of this that Dunbar refused to testify because he feared repercussions at Angola and not because Plaintiff's allegations were meritless.

In sum, to obtain a new trial "on evidentiary grounds," Holliday had to establish, "at a minimum, the verdict is against the great not merely the greater weight of the evidence." *Conway*, 610 F.2d at 363.  Here, Holliday has failed to satisfy that burden.  To the contrary, the Court finds that the jury verdict is supported by the great weight of the evidence.  Indeed, the Court observed the trial, viewed the evidence, and considered the demeanor and testimony of the witnesses, and the Court agrees with the jury verdict.  Accordingly, Holliday's motion for new trial on this issue is denied.

### B.  Alleged Legal Errors

#### *1. Parties Arguments*

Holliday next argues that legal errors were committed.  Specifically, the Court erred (a) by allowing William Blalock to testify by deposition when the requirements of Fed. R. Civ. P. 32 were not met, and (b) by allowing testimony of Holliday's homosexuality to be admitted.

Plaintiff responds that there was no legal error.  With respect to Holliday's argument that Plaintiff could not use William Blalock's deposition for trial purposes, Plaintiff provides a series of correspondences between Plaintiff's counsel and Holliday's prior attorney which support the fact that it was agreed that Blalock's deposition was to be used at trial.  Moreover, Holliday's then counsel participated in the deposition and questioned Blalock on cross examination.  "Holliday cites no authority that the parties cannot stipulate to a video deposition being taken for the purposes of using the video at trial." (Doc. 285 at 9.)  Moreover, Holliday could have subpoenaed Blalock as a live witness but failed to do so.

Plaintiff also argues that evidence of Holliday's homosexuality was properly admitted.  It was relevant to credibility because Holliday denied that he had oral sex with a man, because Blalock and Dunbar had described Holliday's interest in seeing erect penises, and because

Holliday had stated he had a girlfriend.  Ultimately, all of this evidence is probative as to whether Holliday would be inclined to engage in sexual acts with men, and he put the matter at issue when he denied being a homosexual during the above encounters.  In any event, the Court provided a limiting instruction to cure any prejudice.  Further, during voir dire, the Court specifically asked whether any panel member had strong feelings on homosexuality that would affect his or her ability to be fair and impartial, and no one indicated that he or she did.  Thus, there was no prejudice.

Holliday replies first, that Plaintiff did not dispute at trial that he failed to comply with the requirements of Rule 32.  Rather, Plaintiff urged that, during discovery, the parties had agreed to let Blalock testify by deposition.  There was no evidence of any agreement for the deposition to be offered at trial, and Plaintiff's efforts to introduce such evidence now through the above correspondence is in error.  Holliday argues that the documents were not produced to undersigned counsel prior to trial and were not admitted as evidence.  Because Plaintiff failed to produce the documents prior to trial, they should be stricken.

### 2. Blalock Deposition

#### a.  Applicable Law

Rule 32(a)(1) provides, "At a hearing or trial, all or part of a deposition may be used against a party on these conditions:"

> (A) the party was present or represented at the taking of the deposition or had reasonable notice of it;

> (B) it is used to the extent it would be admissible under the Federal Rules of Evidence if the deponent were present and testifying; and

> (C) the use is allowed by Rule 32(a)(2) through (8).

Fed. R. Civ. P. 32(a)(1).  Rule 32(a)(4) provides,

A party may use for any purpose the deposition of a witness, whether or not a party, if the court finds: . . . that the witness is more than 100 miles from the place of hearing or trial or is outside the United States, unless it appears that the witness's absence was procured by the party offering the deposition[.]

Fed. R. Civ. P. 32(a)(4).

### b. Analysis

Here, the Court will deny Defendant's motion on this issue. At trial, Mr. Joiner, trial counsel for Holliday, raised for the first time that Blalock's deposition may not have been a trial deposition. Ms. Hebert, counsel for Plaintiff, represented that the attorneys agreed prior to trial that they would take a trial video deposition of Blalock because he lived more than 100 miles from the Courthouse. Ms. Hebert offered to show the Court the correspondence she now attaches to Plaintiff's opposition which proved that the video deposition was taken for trial purposes. (*See* Docs. 285-1, 285-2, 285-3, 285-4.) She also referenced the *Notice of Video Trial Deposition of William Lee Blalock, Jr.* (Docs. 285-6, 285-7), which stated that the deposition would be "for all purposes, including for use at trial[.]" (*Id.*).

The Court found at trial that reading these documents was unnecessary because Mr. Joiner did not deny that Holliday's prior counsel (Mr. Walters, counsel for the other defendants) received or sent these documents. Rather, Mr. Joiner stated that he was not a part of the case at that time of Blalock's deposition and that he did not have the documents in his file. Further, Mr. Joiner said that was not representing that there was no agreement between Ms. Hebert and Mr. Walters and that he was just objecting to preserve his prior objection for appeal purposed. Perhaps most importantly, Mr. Joiner said that he was "certainly not trying to stop this from being shown." Under the circumstances, even assuming the Court could not consider Plaintiff's attached correspondence (which alone

10

would be dispositive), the Court would deny Holliday's motion based on Mr. Joiner's representations at trial.

Additionally, Blalock testified that he lived in Europa, Mississippi, (which is about 290 miles from the federal courthouse in Baton Rouge, Louisiana) and that he traveled four-and-a-half hours to attend the deposition in Gonzales, Louisiana. (Doc. 271 at 6.) Blalock thus lived well over 100 miles from the place of trial, was outside the subpoena power of the Court, and was therefore unavailable for trial for purposes of the admissibility of the deposition. *See* Fed. R. Civ. P. 32(a)(4), 45(c)(1)(A).

Considering all of this, the Court finds that Holliday's eleventh-hour attempt to object to the use of the deposition on Rule 32 grounds is merely a "gotcha tactic" being employed to prevent the use of extraordinarily damning and powerful testimony. In short, Holliday has failed to show that the requirements of Rule 32 were not satisfied or that he is otherwise entitled to a new trial on this issue. Consequently, his motion will be denied.

### 3. Holliday's Homosexuality

#### a. Applicable Law

"Unless justice requires otherwise, no error in admitting or excluding evidence--or any other error by the court or a party--is ground for granting a new trial, for setting aside a verdict, or for vacating, modifying, or otherwise disturbing a judgment or order." Fed. R. Civ. P. 61. "At every stage of the proceeding, the court must disregard all errors and defects that do not affect any party's substantial rights." *Id.* Thus, "[a] party may claim error in a ruling to admit or exclude evidence only if[,]" *inter alia*, "the error affects a substantial right of the party[.]" Fed. R. Evid. 103(a).

" 'Rule 103 is silent as to what factors a court must consider in determining whether substantial rights have been affected, indicating that the court must proceed on a case to case basis rather than apply a mechanical rule.' " *Munn v. Algee*, 924 F.2d 568, 573 (5th Cir. 1991) (quoting 1 J. Weinstein & M. Berger, *Weinstein's Evidence* ¶ 103[01] at 103–6 (1990)). "However, [the Fifth Circuit has] stated repeatedly that ' "[a]n error is harmless if the court is sure, after reviewing the entire record, that the error did not influence the jury or had but a very slight effect on its verdict." ' " *Id.* (quoting *Pregeant v. Pan Am. World Airways, Inc.*, 762 F.2d 1245, 1249 (5th Cir.1985) (quoting *United States v. Underwood*, 588 F.2d 1073, 1076 (5th Cir.1979))).

Additionally, " 'a new trial is required only if there is a significant possibility that the prejudicial evidence had a substantial impact upon the jury verdict, viewed in light of the entire record.' " *United States v. Richardson*, 781 F.3d 237, 246 (5th Cir. 2015) (stating this principle in the context of a review of a denial of a mistrial) (quoting *United States v. Paul*, 142 F.3d 836, 844 (5th Cir.1998). Great weight is " 'given to the trial court's assessment of the prejudicial effect of the evidence.' "*Id.* Moreover, "prejudice may be rendered harmless by a curative instruction." *Id.* (quoting *United States v. Valle*s, 484 F.3d 745, 756 (5th Cir. 2007) (per curiam)). "Indeed, '[t]his [circuit] has consistently held that an erroneous admission of evidence may be cured by such a limiting instruction because jurors are presumed to follow the court's instructions.' " *Id.* (quoting *Paul*, 142 F.3d at 844). "There is, however, an exception for testimony that is 'so highly prejudicial as to be incurable by the trial court's admonition.' " *Id.* (quoting *United States v. Ramirez–Velasquez*, 322 F.3d 868, 878 (5th Cir. 2003) (internal quotation marks omitted)).

### b. Analysis

In short, the Court will deny Holliday's motion on this issue. Preliminarily, the Court did not err in admitting this evidence. To summarize the Court's prior holding, the Court found that

12

Holliday's homosexuality is evidence which tends to support Johnson's version of what happened to him as well as to Blalock and Dunbar. (*See* Doc. 262 (deciding this issue pretrial).)  Thus, the evidence is relevant.  Fed. R. Evid. 401 ("Evidence is relevant if (a) it has *any* tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." (emphasis added)).  The Court adds that, at trial,  Holliday denied having oral sex with a man. (Tr. II at 43, Doc. 285-8 at 15.)  Consequently, Holliday's orientation is also relevant to the issue of credibility.  Finally, the evidence was not unfairly prejudicial, as it did not have "an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." Fed. R. Evid. 403, 1972 Advisory Committee Note.  In sum, the Court did not admit evidence of Holliday's homosexuality in error.

Even if the Court had so erred, the Court finds that such an admission did not affect a substantial right.  Given the strong evidence submitted against Holliday—including not only Blalock's powerful testimony but also all of the evidence detailed above—any other evidence of Holliday's sexuality was harmless.

Additionally, evidence of Holliday's sexuality was harmless because it was not unduly prejudicial.  The Court finds that, in the year 2020, the mere fact that Holliday is a homosexual is not so prejudicial as to have more than a slight effect on the jury verdict.  Indeed, this is reflected by what happened during voir dire.  The minute entry from the first day of trial explains:

> [D]uring voir dire, the Court asked this question: "Do any of you have such strong feelings on the issue of homosexuality that it would affect your ability to be fair and impartial to both sides[?]" No member of the venire indicated that he or she did.

(Doc. 262 at 2.)  Defendant did not object to this question or have any follow up.  Thus, the claim that the jury was somehow prejudiced against Holliday because he was a homosexual is groundless.

In any event, any prejudice was cured by an instruction.  Specifically, the Court provided a curative instruction at the request of Holliday:

> So sometimes evidence is introduced and it is admissible for one purpose but not admissible for other purposes.  And this is one of those instances.  So I'm going to instruct you that there has been evidence now introduced concerning the homosexuality of Defendant Tyler Holliday.  The Court instructs you that this may only be considered by you for the purpose of deciding whether the alleged sexual abuse claimed by Johnson did or did not occur or whether other evidence of Holliday's conduct, which has been or will be admitted into evidence, did or did not occur and *for no other purpose*.

(Tr. II at 44–45, Doc. 274 at 44–45 (emphasis added).)  As a result, to the extent there was any prejudice (which there was not), said prejudice was cured by this instruction.  Moreover, the Court finds that testimony about Holliday's orientation was not so highly prejudicial as to be incurable.  Consequently, Holliday's motion on this issue is denied.

### C.  Damages

#### 1. Parties' Arguments

Holliday next argues that he is entitled to a new trial or remittitur because the jury verdict of $500,000 in compensatory damages and $250,000 in punitive damages was against the weight of the evidence.  Holliday maintains that the verdict "bore no relation to and was wholly disproportionate to the evidence presented during the trial." (Doc. 277-1 at 7.)  Holliday relies on the fact that Plaintiff refused medical treatment until he was referred to same by an attorney and that, while he was diagnosed with PTSD, he was never treated by a psychiatrist or with medication while at Rayburn.  Holliday also references testimony from Dr. Amy Stogner and argues that Plaintiff's condition was not as serious as the verdict reflects.  In sum, Holliday argues:

> The damage award is clearly excessive and against the weight of the evidence when considering the circumstances which led to the PTSD diagnosis, the brevity of active medical treatment Johnson underwent, and the complete absence of subsequent medical treatment received by Johnson.

(Doc. 277-1 at 8.)  Thus, according to Holliday, the jury acted out of passion or prejudice, and the verdict should be reversed.  Alternatively, the Court should order remittitur because Plaintiff "was, at best, entitled to modest damages when considering the circumstances which led to the PTSD diagnosis, the brevity of active medical treatment Johnson underwent, and the complete absence of subsequent medical treatment received by Johnson." (*Id.*)

Plaintiff responds that the jury award was not excessive.  The verdict form reflects that the jury found Plaintiff was raped at least twice.  The evidence shows that Plaintiff was diagnosed with PTSD and suffered other psychological trauma from the injury.  Plaintiff also points to other testimony from Dr. Stogner and Plaintiff's symptoms and treatment.  Lastly, Plaintiff cites his own testimony about the harm caused by the rapes.  Plaintiff closes by citing to comparable rape cases which awarded similar compensatory and punitive damages.

Holliday responds that Plaintiff relies on a case, *Tubby v. Allen*, No. 16-972, 2019 WL 4565072 (E.D. Tex. Sept. 3, 2019), *report and recommendation adopted*, No. 16-972, 2019 WL 4538028 (E.D. Tex. Sept. 19, 2019), which was based on three cases, none of which are comparable to the instant matter.  Holliday then reiterates the evidence purporting to show that Plaintiff's psychological injuries were minimal.  Holliday concludes, "The damage award is clearly excessive and against the weight of the evidence when considering the circumstances which led to the PTSD diagnosis, the brevity of active medical treatment Johnson underwent, and the complete absence of subsequent medical treatment received by Johnson." (Doc. 287 at 5.)

### 2. Applicable Law

Again, "[a] new trial may be granted . . .  if the district court finds the verdict is against the weight of the evidence, the damages awarded are excessive, the trial was unfair, or prejudicial error was committed in its course." *Smith v. Transworld Drilling Co.*, 773 F.2d at 613 (5th Cir.

1985) (citations omitted).  But, "new trials should not be granted on evidentiary grounds unless, at a minimum, the verdict is against the great not merely the greater weight of the evidence." *Conway*, 610 F.2d 363 (citation omitted).

"When a jury verdict results from 'passion or prejudice,' a new trial is the proper remedy." *Hale v. Wood Grp. PSN, Inc.*, 769 F. App'x 113, 115–16 (5th Cir. 2019) (quoting *Wells v. Dallas Indep. School Dist.*, 793 F.2d 679, 683 (5th Cir. 1986)). "Where a damage award is 'merely excessive, that is, so large as to be contrary to right reason,' remittitur is the appropriate remedy." *Id.* (quoting *Wells*, 793 F.3d at 683–84).  "Applying the 'clearly excessive rule' for determining the excessiveness of an award, jury awards will not be disturbed unless they are 'so large as to shock the judicial conscience, so gross or inordinately large as to be contrary to right reason, so exaggerated as to indicate bias, passion, prejudice, corruption, or other improper motive, or as clearly exceeding [the] amount that any reasonable man could feel the claimant is entitled to.' " *Id.* at 115–16 (quoting *Caldarera v. Eastern Airlines, Inc.*, 705 F.2d 778, 784 (5th Cir. 1983) (cleaned up)). "Under this standard, courts can look to prior awards resulting from similar injuries to provide guidance in the excessiveness determination." *Id.* at 116 (citing *Williams v. Chevron, USA, Inc.*, 875 F.2d 501, 506 (5th Cir. 1989)).

Additionally, "[t]he Supreme Court has articulated three factors that courts should consider in determining whether an award of punitive damages is constitutionally excessive: (1) the defendant's reprehensibility or culpability; (2) the relationship between the penalty and the harm to the victim caused by the defendant's actions; and (3) the sanctions imposed in other cases for comparable misconduct." *Lewis v. Pugh*, 289 F. App'x 767, 777 (5th Cir. 2008) (citing *Cooper Indus., Inc. v. Leatherman Tool Group, Inc.*, 532 U.S. 424, 434–35, 121 S.Ct. 1678, 149 L.Ed.2d 674 (2001)).

Plaintiff cites to *Tubby* as guidance for the damage awards in this case. There, plaintiff alleged that a correctional officer removed him from his living area, took him to a laundry room, and then sexually abused him in a make-shift shower. *Tubby*, 2019 WL 4565072, at *1. Plaintiff claimed damages in the form of emotional anxiety, fear, humiliation, monetary loss, and past and future pain and suffering. *Id.* at *5. Plaintiff suffered PTSD but lacked the financial means to seek treatment. *Id.* He testified that he suffered nightmares, emotional trauma, stress, and anxiety. *Id.*

On a motion for default judgment, the magistrate judge looked at other sexual assault cases involving a correctional or police officer and recommended an award of $300,000 in compensatory damages. *Id.* at *6 (citing, *inter alia*, *Ortiz v. Lasker, Jr.*, No. 08-6001, 2010 WL 3476017, at *1–2 (W.D.N.Y. Aug. 30, 2010) (awarding $250,000 in compensatory and $250,000 in punitive to female inmate who was raped twice by a correctional officer and who "suffer[ed] from classic symptoms of [PTSD] as outlined by the counselor"); *Hall v. Terrell*, 648 F. Supp. 2d 1229, 1231 (D. Colo. 2009) (noting that, following bench trial, court awarded $350,000 in compensatory damages and $1,000,000 in punitive damages to plaintiff who was the "victim of both ongoing sexual abuse and a brutal rape by [a] guard")). The magistrate also recommended an award of $350,000 in punitive damages, explaining:

> The conduct at issue here involved the rape of a person in custody who was dependent on the correctional officer for safety and protection, as well as daily necessities. Defendant Allen's use of his position as a correctional officer to gain access to and victimize a person in custody was an outrageous abuse of power and authority.

*Id.* at *8. The district court adopted the magistrate judge's report and recommendation and stated that he was "of the opinion that the findings and conclusions of the Magistrate Judge [were] correct[.]" *Tubby*, 2019 WL 4538028, at *1.

17

*Tubby* also relied on *Doe v. Neal*, No. 14-102, 2015 WL 3688259 (W.D. Tex. June 12, 2015). There, a police officer conducted a traffic stop, placed the plaintiff in handcuffs, began "searching" her by groping her breasts, raped her, and afterward threatened her, was arrested, and then "brazenly made good on his threat and went to the victim's home in search of her." *Id.* at *1–4. Since the incident, plaintiff cried daily, found it hard to trust people, and had become angry and aggressive. *Id.* An expert opined that she suffered from mild to moderate PTSD and would require weekly individual treatment with a therapist for three to five years. *Id.* at *2.

On a motion for default judgment, the Court awarded $750,000 in compensatory damages and $1,000,000 in punitive damages against the officer. *Id.* at *4. *Doe v. Neal* relied on other cases finding similar emotional damages in sexual assault cases. *Id.* at *4 (citing, *inter alia*, *Meyer v. Nava*, No. 04–4099, 2007 WL 3046583, at *3 (D.Kan. Oct.17, 2007) ($750,000 for emotional and mental distress inflicted when plaintiff was raped by a jail employee); *Cash v. Cty. of Erie*, No. 04–0182, 2009 WL 3199558, at *3 (W.D.N.Y. Sept.30, 2009) ($500,000 award for emotional distress caused by sexual abuse inflicted by a jailor upon an inmate in his custody)). The Court also cited a comparable punitive damage case. *Id.* (citing *Lewis v. Pugh*, 289 F. App'x 767, 777 (5th Cir. 2008) (upholding a $250,000 punitive damage award in case involving police officer's rape because: "First, [the officer's] conduct, utilizing a position of trust to rape and assault a vulnerable woman, is particularly reprehensible. Second, the ratio between the punitive and compensatory damages in this case is 5:1, a ratio not so disproportionate as to jar one's constitutional sensibilities. . . . Finally, the comparable criminal sanctions for [the officer's] conduct are serious, as indicated by the fact that he is currently serving a 12–year sentence for the rape and assault of [the victim]" (cleaned up)).

### 3. Analysis

Having carefully considered the issue, the Court will deny Defendant's motion on this issue. In short, the compensatory and punitive damage awards in this case are not against the great weight of the evidence.

With respect to compensatory damages, the Court finds *Tubby*, *Doe v. Neal*, and the authority they rely upon sufficiently analogous to support this jury's compensatory damage awards, and the Court rejects Defendant's attempts to distinguish them. All of these cases involve emotional trauma (including PTSD but also other emotional injuries and mental suffering) following at least one and sometimes more rapes by someone in a position of authority.

The facts of the instant case are analogous. Prior to the incidents with Holliday, Plaintiff had never been diagnosed with any kind of a mental issue. (Tr. II at 266, Doc. 285-8 at 29.) He had also never sought any mental treatment. (*Id.*)

The jury found that Holliday raped Plaintiff at least two times. Specifically, the jury awarded two sets of compensatory damages—(1) for those damages suffered "up to and including March 21, 2014," and (2) for those damages sustained on March 22, 2014. (Doc. 269 at 6.) Plaintiff was awarded $250,000 for each set of rapes for a total of $500,000. (*Id.*)

Following the incidents, Plaintiff was seen by Dr. Amy Stogner, a social worker and someone who worked in the Mental Health Department at Rayburn Correctional Center (where Plaintiff went after Angola). (Tr. II at 53–57, Doc. 274 at 53–57.) Dr. Stogner testified that Johnson showed signs of PTSD, including being unable to sleep, issues with increased anxiety, issues with depressions, and issues with a loss of appetite. (*Id.*) Additionally, Plaintiff had issues with hypervigilance and would be triggered by the smell of cologne coming up behind him. (*Id.* at

57; *see also id.* at 267 (Plaintiff testifying to issues with cologne.)  Plaintiff also has trouble with closed rooms. (*Id.* at 267.)

Plaintiff met frequently with Dr. Stogner at Rayburn, and they would go over symptoms so that he could find coping skills to handle the triggers. (*Id.* at 57–58.)  Plaintiff did not want drugs, so Stogner gave him nonmedical ways of dealing with his stress. (*Id.* at 59.)  He did not want drugs because, when he went to prison, he was "on drugs real bad and [he is] a recovering addict." (*Id.* at 265–266.)  He has been clean and sober for 26 years and did not want to become dependent on psychotic medication. (*Id.* at 266.)  This was a reasonable justification for not taking medications to deal with his PTSD.

Plaintiff's condition also initially prevented him from being on work release because of his increase in panic attacks and anxiety. (*Id.* at 59–60.)  Plaintiff arrived at Rayburn in March 2014, and he was denied work release until August 5, 2015, until his condition stabilized for a period of time. (*Id.* at 60.)  This is further evidence of the severity of Plaintiff's trauma.

Plaintiff also explained why he did not see a psychiatrist until after his attorney recommended one. Specifically, Plaintiff said that he "was trying to put it out of [his] mind as much as [he] could and get it out of [his] thoughts as much as [he] could," but he told his attorney that he was having trouble sleeping and concentrating. (Tr. II at 265, Doc. 285-8 at 28)  His attorney said that he could see someone who could help. (*Id.*)  A doctor diagnosed him with PTSD. (*Id.*)  All of this is a reasonable explanation, and the jury was entitled to believe it.

Plaintiff's mental status improved some on a day-to-day basis.  He still has flashbacks and is triggered by cologne, but he deals with it pretty well. (Tr. II. At 268, Doc. 285-8 at 31.)  He now sees a counselor every three months and a psychiatrist every six months. (*Id.* at 269–70, Doc. 285-

8 at 32–32.)  He also takes an anti-depressant. (*Id.*)  This testimony further demonstrates that Holliday's conduct has caused harm which Plaintiff still suffers from to this day.

Again, "jury awards will not be disturbed unless they are 'so large as to shock the judicial conscience, so gross or inordinately large as to be contrary to right reason, so exaggerated as to indicate bias, passion, prejudice, corruption, or other improper motive, or as clearly exceeding [the] amount that any reasonable man could feel the claimant is entitled to.' " *Hale*, 769 F. App'x at 115–16 (citations omitted).  The instant case falls well short of this standard.  The facts and case law detailed above demonstrate how this compensatory damage award is quite reasonable.  As a result, Defendant's motion on this issue will be denied.

The same result is warranted on the issue of punitive damages.  Again, the Court examines "(1) the defendant's reprehensibility or culpability; (2) the relationship between the penalty and the harm to the victim caused by the defendant's actions; and (3) the sanctions imposed in other cases for comparable misconduct." *Lewis*, 289 F. App'x at 777. Here, Holliday's raping of the Plaintiff is highly reprehensible; it is made all the worse by (1) Holliday's *repeated* raping of Plaintiff (*see* Doc. 269 at 4); (2) Holliday's threats to silence the Plaintiff after the rapes (Tr. II at 232, Doc. 285-8 at 25); and (3) Holliday's sexual assaults on others beside the Plaintiff (*see* Blalock Dep. 10–13, 20, Doc. 271 at 11–14, 20).

Further, the punitive damage award in this case is only half of the total compensatory damage award, and such a ratio is not constitutionally impermissible. *See Lewis*, 289 F. App'x at 777 (stating, where jury awarded $50,000 in compensatory damages and $250,000 in punitive for a sexual assault claim, that "the ratio between the punitive and compensatory damages in this case is 5:1, a ratio not so disproportionate as to 'jar one's constitutional sensibilities.' " (citation omitted)).

Finally, looking at "sanctions imposed in other cases for comparable conduct," the damage awards in *Tubby* ($350,000), *Doe v. Neal* ($1,000,000), *Lewis* ($250,000), and their authority align with this case ($250,000). The essence of all of these punitive damage awards is the same: a public servant in a position of power and authority abused his office by raping and exploiting a vulnerable victim in custody. *See Tubby*, 2019 WL 4565072, at *8. Indeed, the above authority support awards even higher than the one in this case, and this Court sees no reason to disturb the jury verdict on this issue.

In short, the punitive damage award was not clearly excessive. Defendant's motion on this issue will be denied.

## IV.    Conclusion

Accordingly,

**IT IS ORDERED** that the *Motion for New Trial or, in the Alternative, Motion for Remittitur* (Doc. 277) filed by Defendant Tyler Holliday is **DENIED**.

Signed in Baton Rouge, Louisiana, on January 26, 2021.


**JUDGE JOHN W. deGRAVELLES**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**